# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WILLIAM T. OBEID, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 11900-VCL |
| | ) | |
| MICHAEL R. HOGAN, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| GEMINI REAL ESTATE ADVISORS, | ) | |
| LLC and GEMINI EQUITY | ) | |
| PARTNERS, LLC, Delaware Limited | ) | |
| Liability Companies, | ) | |
| | ) | |
| Nominal Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 27, 2016
Date Decided: June 10, 2016

Stephen E. Jenkins, Catherine A. Gaul, ASBHY & GEDDES, P.A., Wilmington, Delaware; Stephen B. Meister, Alexander D. Pencu, Remy Stocks, MEISTER SEELIG & FEIN LLP, New York, New York; *Counsel for Plaintiff William T. Obeid.*

Douglas D. Herrmann, Christopher B. Chuff, PEPPER HAMILTON LLP, Wilmington, Delaware; Michael L. Smith, Michael J. Collins, BREWER, ATTORNEYS & COUNSELORS, New York, New York; *Counsel for Nominal Defendants Gemini Real Estate Advisors, LLC and Gemini Equity Partners, LLC.*

**LASTER, Vice Chancellor.**

Plaintiff William T. Obeid contends that defendant Michael R. Hogan, a retired federal judge, cannot serve as the sole member of two parallel special litigation committees, one for nominal defendant Gemini Equity Partners, LLC and the other for nominal defendant Gemini Real Estate Advisors, LLC. Obeid is entitled to summary judgment on this issue.

The operating agreement for Gemini Equity Partners, LLC adopts a governance structure paralleling that of a corporation, which is perhaps ironic given the word "Partners" in its name. To avoid confusion, this decision calls it the "Corporate LLC." By opting for a corporate-style governance structure, the drafters evidenced their desire to have corporate-style legal rules govern the entity. Under *Zapata v. Maldonodo*, 430 A.2d 779 (Del. 1981), Judge Hogan cannot serve as the sole member of a special litigation committee for that entity because he is not a director.

The operating agreement for Gemini Real Estate Advisors, LLC adopts a manager-managed governance structure. This decision therefore calls it the "Manager-Managed LLC." The distinction that its operating agreement draws between active managers and passive members is likely sufficient to have *Zapata* control, but this decision need not rule on that basis. Specific provisions in the entity's operating agreement make clear that managers only can delegate core governance functions to other managers. Judge Hogan cannot serve as the sole member of a special litigation committee for that entity either because he is not a manager.

Separately, Obeid contends that he cannot be removed as a member of the board of directors of the Corporate LLC except by a unanimous vote of the members of that

1

entity. The plain language of the Corporate LLC's operating agreement does not support his position, so this aspect of his motion is denied.

## I.     FACTUAL BACKGROUND

The facts are drawn from the affidavits and supporting documents that the parties submitted in connection with Obeid's motion for summary judgment. When considering such a motion, "the court must view the evidence in the light most favorable to the non-moving party." *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 99 (Del. 1992). In this case, the material facts are undisputed.

### A.     The Entities

The Corporate LLC and the Manager-Managed LLC jointly manage over $1 billion in real estate assets, including eleven hotels and twenty-two commercial properties. Until the disputes giving rise to this litigation, Obeid managed the day-to-day operations of the hospitality division. Non-parties Christopher S. La Mack and Dante A. Massaro managed the day-to-day operations of the commercial division.

The Corporate LLC is a Delaware limited liability company. Obeid, La Mack, and Massaro are its only members, with each holding a one-third member interest. The internal affairs of the Corporate LLC are governed by its limited liability company agreement (the "Corporate LLC Agreement"). That agreement establishes a governance structure paralleling that of a corporation in which power over the entity is vested in a board of directors (the "Corporate Board"). Until Obeid's purported removal in July 2014, Obeid, La Mack, and Massaro comprised the Corporate Board.

The Manager-Managed LLC is also Delaware limited liability company. Obeid, La Mack, and Massaro are again the only members, with each again holding a one-third member interest. The internal affairs of the Manager-Managed LLC are governed by its limited liability company agreement (the "Manager-Managed LLC Agreement"). That agreement establishes a governance structure in which power over the entity is vested in its managers. Obeid, La Mack, and Massaro serve as the entity's only managers.

**B.      Litigation Begins.**

On July 1, 2014, La Mack and Massaro voted to remove Obeid as President and Operating Manager of the Manager-Managed LLC and to install Massaro in his place. They did not attempt to remove Obeid as a manager. Section 5.2.1 of the Manager-Managed LLC Agreement provides that Obeid, La Mack, and Massaro are each "entitled to serve as a Manager of the Company for so long as he is a Member of the Company." La Mack and Massaro contemporaneously filed an action in North Carolina state court asserting claims against Obeid relating to his tenure as Operating Manager of the Manager-Managed LLC (the "North Carolina Action").

In August 2014, Obeid filed an action against La Mack and Massaro in the United States District Court for the Southern District of New York (the "New York Federal Action"). The gist of the lawsuit was that La Mack and Massaro had started competing companies using assets belonging to the Corporate LLC and the Manager-Managed LLC. Obeid's complaint asserted claims directly based on his rights as a member of the entities and derivatively on behalf of the entities themselves. On March 5, 2015, the court in the North Carolina Action stayed that action in deference to the New York Federal Action.

3

In mid-March 2015, Obeid filed a second action in New York, this time in state court, against a third party that competed with the Corporate LLC and Manager-Managed LLC (the "New York State Action"). The gist of the lawsuit was that La Mack and Massaro were improperly selling properties belonging to the Corporate LLC and the Manager-Managed LLC to a competitor in return for side benefits.

In July 2015, La Mack and Massaro asserted counterclaims against Obeid in the New York Federal Action. Among other things, the counterclaims included counts for fraud and breach of the LLC agreements governing the entities.

The Corporate LLC and the Manager-Managed LLC owned the properties that were the subject of the New York State Action through subsidiaries. In September 2015, La Mack and Massaro caused the subsidiaries to file for bankruptcy. The bankruptcy court later approved a stipulated order which lifted the automatic stay to allow the New York Federal Action and the New York State Action to proceed.

In January 2016, the court in the New York Federal Action approved the filing of an amended complaint that brought the claims asserted in the New York State Action into the federal proceeding. The operative complaint in the New York Federal Action currently asserts a total of twenty-one counts against La Mack, Massaro, their affiliates, and third parties. Some of the counts assert derivative claims on behalf of the Corporate LLC or the Manager-Managed LLC.

Obeid contended that demand was futile for purposes of the derivative claims because La Mack and Massaro "suffer from conflicts of interest and divided loyalties that preclude them from exercising their independent business judgment on this matter." Dkt.

4

28 Ex. 1 at 87. The New York Federal Action subsequently progressed well beyond the stage where La Mack and Massaro could contest Obeid's authority to assert derivative claims on behalf of the entities on the theory that demand should have been made. Indeed, discovery in the New York Federal Action has been completed. Trial is scheduled for October 2016.

## C.    The Joint Special Meeting

On June 15, 2015, the Corporate LLC and the Manager-Managed LLC hired the law firm of Brewer, Attorneys & Counselors (the "Brewer Firm") to serve as outside counsel. Obeid contends that La Mack and Massaro hired the Brewer Firm without his input. The Brewer Firm represents the Corporate LLC and the Manager-Managed LLC in this proceeding.

In mid-July 2015, the Brewer Firm suggested that La Mack, Massaro, and Obeid hold a joint special meeting of the Corporate Board and the managers of the Manager-Managed LLC (the "Joint Special Meeting"). The purpose of the meeting was to address various business matters that had gone unattended in light of the pending litigation. Through counsel, Obeid, La Mack, and Massaro exchanged emails proposing various topics for the agenda. Obeid's counsel proposed restoring Obeid's access to his email account, addressing issues surrounding the Brewer Firm's engagement, and discussing certain statements that La Mack and Massaro had made to investors. La Mack and Massaro's counsel countered by proposing to discuss Obeid's allegedly improper interference with the operations of the Corporate LLC and the Manager-Managed LLC. To this observer, the exchange appears to have been largely unproductive.

On July 21, 2015, Obeid sent a singular letter in which he formally noticed both a special meeting of the Corporate Board (as required by the Corporate LLC Agreement) and a special meeting of the managers of the Manager-Managed LLC (as required by the Manager-Managed LLC Agreement). The two meetings were noticed for the same date, time, and place, giving rise to the Joint Special Meeting.

The Joint Special Meeting took place on July 28, 2015. No one kept minutes or prepared any formal resolutions. During the meeting, the Brewer Firm proposed that a retired federal judge should be hired to function as a special litigation committee for each entity to "investigate, analyze and make a recommendation whether to pursue the derivative claims on behalf of [the Corporate LLC and the Manager-Managed LLC] in the New York Federal Action, including the claims asserted against La Mack and Massaro." Pencu Aff. ¶ 9. La Mack and Massaro voted in favor of the concept of a special litigation committee. Obeid voted against it.

It is undisputed that the formal notice for the Joint Special Meeting did not identify the potential creation of parallel special litigation committees as items of business, nor did it identify the hiring of a retired federal judge to serve as the sole member of the parallel committees. None of the preliminary emails mentioned that topic either.

It is undisputed that during the Joint Special Meeting, no formal resolutions creating parallel special litigation committees were either presented or adopted. The idea was considered, and a vote was held, but only as a concept.

6

After the Joint Special Meeting, the Brewer Firm circulated the names and resumes of two retired federal judges. Their names had been mentioned during the Joint Special Meeting as candidates for service on the parallel special litigation committees. No one had voted to hire either one of them during the Joint Special Meeting or to form parallel special litigation committees with either as its sole member.

On August 24, 2015, La Mack and Massaro executed an engagement letter with Judge Hogan, one of the retired federal judges. Judge Hogan previously served as a federal judge for over forty years, including as Chief Judge of the United States District Court for the District of Oregon from 1995 to 2002. He is now a full-time mediator.

La Mack and Massaro each signed Judge Hogan's engagement letter as a "member-manager" of the Corporate LLC and the Manager-Managed LLC. It is undisputed that Judge Hogan is not a director of the Corporate LLC, nor is he a manager of Manager-Managed LLC. Formal resolutions have never been approved that would establish or empower parallel special litigation committees and appoint Judge Hogan to that dual role.

**D.     La Mack And Massaro Attempt To Remove Obeid From The Corporate Board.**

On September 22, 2015, La Mack and Massaro convened a telephonic special meeting of the members of the Corporate LLC. During that meeting, La Mack and Massaro voted to remove Obeid as a director. Obeid voted against his removal.

Since September 22, 2015, Obeid has not had any managerial role with the Corporate LLC. La Mack and Massaro have made all decisions on behalf of the entity.

7

**E.      Obeid Learns About Judge Hogan's Engagement.**

In mid-November 2015, Obeid learned through his counsel that La Mack and Massaro had hired Judge Hogan. Obeid had not previously known about the engagement.

By letter dated December 28, 2015, Judge Hogan introduced himself to La Mack, Massaro, and Obeid, informed them of his role, and "express[ed] a willingness to begin his investigative work in performing the function of a special litigation committee." Dkt. 28 at 9. The December 28 letter tracked a draft that the Brewer Firm had provided to Judge Hogan several days earlier. *Compare* Pencu Aff. Ex. 6, *with id.* Ex. 7. In the letter, Judge Hogan stated that he planned to seek a stay of the New York Federal Action to permit him to perform his work as the sole member of the parallel special litigation committees. When Judge Hogan sent the letter, discovery in the New York Federal Action was scheduled to conclude at the end of January 2016, making it a strange and belated occasion on which to seek a stay. *See Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1996 WL 33167168 (Del. Ch. June 6, 1996) (Allen, C.).

On January 11, 2016, Obeid's counsel met with Judge Hogan and representatives of the Brewer Firm. During that meeting, Judge Hogan acknowledged that he had not been formally appointed as a director of the Corporate LLC or a manager of Manager-Managed LLC and that he was serving in an advisory capacity to the Brewer Firm.

**F.      This Litigation**

On January 12, 2016, Obeid filed this action. He seeks (i) a declaratory judgment that Judge Hogan cannot act as a special litigation committee for either the Corporate LLC or the Manager-Managed LLC and that he has no authority over any derivative

8

claims, including those asserted in the New York Federal Action, (ii) an injunction preventing Judge Hogan from taking any action on behalf of either the Corporate LLC or the Manager-Managed LLC or attempting to exert any influence or control over any derivative claim, and (iii) a declaratory judgment that Obeid is still a director of the Corporate LLC and that all actions taken by the Corporate Board since Obeid's purported removal are void. Obeid moved for summary judgment.

## II. LEGAL ANALYSIS

Summary judgment is an appropriate vehicle for construing entity agreements as a matter of law. *See Weinstock v. Lazard Debt Recovery GP, LLC*, 2003 WL 21843254, at *2 (Del. Ch. Aug. 8, 2003) (Strine, V.C.). Obeid contends that the plain language of the Corporate LLC Agreement and the Manager-Managed LLC Agreement calls for the entry of summary judgment in his favor.

### A. Judge Hogan's Ability To Serve As The Sole Member Of A Special Litigation Committee For The Corporate LLC

Obeid contends that Judge Hogan cannot serve as a one-man special litigation committee for the Corporate LLC, which adopted a governance structure paralleling that of a Delaware corporation. Judge Hogan is not a director of the Corporate LLC. Under *Zapata*, he therefore cannot serve as a one-man special litigation committee. Summary judgment on this issue is granted in favor of Obeid.

### 1. The Implications Of Mimicking A Corporation's Governance Structure

It is frequently observed that LLCs "are creatures of contract,"[1] which they primarily are.[2] The Delaware Limited Liability Company Act (the "LLC Act") provides

---

[1] *TravelCenters of Am., LLC v. Brog,* 2008 WL 1746987, at *1 (Del. Ch. Apr. 3, 2008); *accord, e.g.*, *Henson v. Sousa*, 2015 WL 4640415, at *1 (Del. Ch. Aug. 4, 2015) ("LLCs, as this Court has repeatedly pointed out, are creatures of contract."); *Touch of It. Salumeria & Pasticceria, LLC v. Bascio,* 2014 WL 108895, at *4 (Del. Ch. Jan. 13, 2014) ("[R]ecognizing that LLCs are creatures of contract, I must enforce LLC agreements as written."); *Kuroda v. SPJS Hldgs., LLC*, 971 A.2d 872, 880 (Del. Ch. 2009) ("Limited liability companies are creatures of contract . . . ."); *see Fisk Ventures LLC v. Segal*, 2008 WL 1961156, at *8 (Del. Ch. May 7, 2008) ("In the context of limited liability companies, which are creatures . . . of contract, those duties or obligations [among parties] must be found in the LLC Agreement or some other contract." (footnote omitted)).

[2] The adverb "primarily" recognizes the critical but sometimes overlooked non-contractual dimensions of the entity. *See In re Seneca Invs. LLC,* 970 A.2d 259, 261 (Del. Ch. 2008) ("An LLC is primarily a creature of contract. . . .").

> [T]he purely contractarian view discounts core attributes of the LLC that only the sovereign can authorize, such as its separate legal existence, potentially perpetual life, and limited liability for its members. *See* 6 *Del. C.* §§ 18-201, 18-303. To my mind, when a sovereign makes available an entity with attributes that contracting parties cannot grant themselves by agreement, the entity is not purely contractual. Because the entity has taken advantage of benefits that the sovereign has provided, the sovereign retains an interest in that entity. . . . Put more directly, an LLC agreement is not an exclusively private contract among its members precisely because the LLC has powers that only the State of Delaware can confer. Those powers affect the rights of third parties, who at a minimum must take into account the LLC's separate legal existence and its members' limited liability shield.

*In re Carlisle Etcetera LLC*, 114 A.3d 592, 605-06 (Del. Ch. 2015); *see Feeley v. NHAOCG, LLC*, 62 A.3d 649, 659-63 (Del. Ch. 2012); *Auriga Capital Corp. v. Gatz Props., LLC*, 40 A.3d 839, 849-56 (Del. Ch. 2012) (Strine, C.), *aff'd*, 59 A.3d 1206 (Del. 2012). *See generally* Daniel S. Kleinberger, *Two Decades of "Alternative Entities": From Tax Rationalization Through Alphabet Soup To Contract As Deity*, 14 Fordham J. Corp. & Fin. L. 445, 460-71 (2009) (identifying historical, jurisprudential, and policy

that "[i]t is the policy of this chapter to give maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements." 6 *Del. C.* § 18-110(b). Because of this freedom, "the parties have broad discretion to use an LLC agreement to define the character of the company and the rights and obligations of its members." *Kuroda*, 971 A.2d at 880. One "attraction of the LLC form of entity is the statutory freedom granted to members to shape, by contract, their own approach to common business 'relationship' problems." *Haley v. Talcott*, 864 A.2d 86, 88 (Del. Ch. 2004) (Strine, V.C.). "Virtually any management structure may be implemented through the company's governing instrument." Robert L. Symonds, Jr. & Matthew J. O'Toole, *Delaware Limited Liability Companies* § 9.01[B], at 9-9 (2015).

Using the contractual freedom that the LLC Act bestows, the drafters of an LLC agreement can create an LLC with bespoke governance features or design an LLC that mimics the governance features of another familiar type of entity. The choices that the drafters make have consequences. If the drafters have embraced the statutory default rule

reasons why LLCs should not be regarded as purely contractual entities); Sandra K. Miller, *The Best of Both Worlds: Default Fiduciary Duties and Contractual Freedom in Alternative Business Entities*, 39 J. Corp. L. 295, 315-24 (2014) (reviewing empirical studies and presenting data about alternative entity agreements that undermine premises of purely contractarian approach). Whatever one's personal thoughts might have been on the matter, "the General Assembly in 2013 adopted an amendment to the LLC Act inconsistent with the purely contractarian view" of LLCs. *Carlisle*, 114 A.3d at 605 (citing H.B. 126, 147th Gen. Assemb. (Del. 2013) (amending 6 *Del. C.* § 18–1104 to provide that "In any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern")); *see* Miller, *supra*, at 314 (noting that the debate over the purely contractual status of LLCs "was resolved by legislation that was signed into law on June 30, 2013").

of a member-managed governance arrangement, which has strong functional and historical ties to the general partnership (albeit with limited liability for the members), then the parties should expect a court to draw on analogies to partnership law.[3] If the drafters have opted for a single managing member with other generally passive, non-managing members, a structure closely resembling and often used as an alternative to a limited partnership, then the parties should expect a court to draw on analogies to limited partnership law.[4] If the drafters have opted for a manager-managed entity, created a board of directors, and adopted other corporate features, then the parties to the agreement should expect a court to draw on analogies to corporate law.[5] Depending on the terms of

---

[3] *See* 6 *Del. C.* § 18-402 (establishing the default rule that management of an LLC is "vested in its members in proportion to the then current . . . interest of members in the profits of the limited liability company owned by all of the members," with the decision of members owning a majority of such profit interest controlling); *Kelly v. Blum*, 2010 WL 629850, at *11 n.73 (Del. Ch. Feb. 24, 2010) (identifying parallel between member-managed LLC and partnership). As in a general partnership, the LLC Act's "default framework generally contemplates a unity of membership and management control." Symonds & O'Toole, *supra*, § 9.01[A][1], at 9-5.

[4] *See Kelly*, 2010 WL 629850, at *11 n.73. The field of limited partnership law is particularly fertile, because the LLC Act was "modeled on the popular Delaware LP Act" and "its architecture and much of its wording is almost identical to that of the Delaware LP Act." *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 290 (Del. 1999). When a manager-managed entity has passive members, those members are often "treated much like a limited partner under the LP Act." *Id.*

[5] *See Kelly*, 2010 WL 629850, at *11 n.73 (suggesting corporate analogy for manager-managed LLC where operating agreement created board of managers similar to that of corporation); Symonds & O'Toole, *supra*, § 9.01[B], at 9-9 ("A limited liability company may be structured on the basis of a corporate model . . . ."); *see, e.g., Fla. R & D Fund Inv'rs, LLC v. Fla. BOCA/Deerfield R & D Inv'rs, LLC*, 2013 WL 4734834, at *2, *7 (Del. Ch. Aug. 30, 2013) (addressing LLC agreement that created a board of directors to manage the entity); *Kahn v. Portnoy*, 2008 WL 5197164, at *4 (Del. Ch. Dec.

12

the agreement, analogies to other legal relationships may also be informative. *See JAKKS*

*Pac., Inc. v. THQ/JAKKS Pac., LLC*, 2009 WL 1228706, at \*2 (Del. Ch. May 6, 2009)

(explaining that although a party to the LLC agreement at issue is "technically a member

of the LLC," its economic interest "is less that of an equity owner and more akin to a

licensor with rights to royalties based on sales").

It is important not to embrace analogies to other entities or legal structures too

broadly or without close analysis, because "the flexibility inherent in the limited liability

company form complicates the task of fixing such labels or making such comparisons."

Symonds & O'Toole, *supra*, § 1.04[C][1], at 1-17. The drafters of an LLC agreement

may have adopted partnership-like features for particular aspects of their relationship and

corporate features for others. For example,

> [m]embers of a limited liability company may be similar to stockholders of
> a corporation or to limited partners in a limited partnership insofar as
> members, stockholders, and limited partners all enjoy statutory limited
> liability. The stockholder analogy may falter, however, depending on the
> nature of a member's stake in the limited liability company. A stockholder
> necessarily is one who holds stock, and stock usually constitutes some sort

---

11, 2008) (interpreting LLC agreement which created board of directors to manage the
entity and which provided that the "'authority, powers, functions and duties (including
fiduciary duties)' of the board of directors will be identical to those of a board of
directors of a business corporation organized under the Delaware General Corporation
Law . . . unless otherwise specifically provided for in the LLC Agreement"); *Seneca
Invs.*, 970 A.2d at 261 (interpreting LLC agreement which provided that, subject to
certain exceptions, "the Company will be governed in all respects as if it were a
corporation organized under and governed by the Delaware General Corporation Law . . .
and the rights of its Stockholders will be governed by the DGCL"); *see also Matthew v.
Laudamiel*, 2012 WL 2580572, at \*1 (Del. Ch. June 29, 2012) (interpreting LLC
agreement that created board of managers to oversee business and affairs of entity); *VGS,
Inc. v. Castiel*, 2003 WL 723285, at \*2 (Del. Ch. Feb. 28, 2003) (same).

of economic stake in the corporation. By contrast, a person may be admitted as a member without acquiring a limited liability company interest (i.e., economic rights) in the limited liability company.

*Id.* at 1-17 to -18 (footnote omitted). The analogy may break down in other areas as well, such as in terms of the extent to which the interests and the rights they carry are fully alienable. *Compare* 8 *Del. C.* § 202 (establishing default rule of alienability with transferee obtaining stockholder status), *with* 6 *Del. C.* § 18-702 (establishing default rule of assignability with assignee having "no right to participate in the management of the business and affairs of a limited liability company except as provided in a limited liability company agreement" or until admitted as a member).

Analogies to other bodies of law may be stronger in certain substantive areas. For example, "[t]he derivative suit is a corporate concept grafted onto the limited liability company form." *Elf Atochem*, 727 A.2d at 293. Absent other convincing considerations, case law governing corporate derivative suits is generally applicable to suits on behalf of an LLC.[6]

In this case, the Corporate LLC Agreement substantially re-creates the governance structure of a Delaware corporation using language drawn from the corporate domain. As noted, the Corporate LLC Agreement creates a manager-managed LLC and empowers the Corporate Board to act as the manager. Section 9(a) of the Corporate LLC Agreement

---

[6] *Compare VGS*, 2003 WL 723285, at *11 (applying corporate precedent), *and Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 1998 WL 832631, at *5 n.14 (Del. Ch. Nov. 10, 1998) (same), *with CML V, LLC v. Bax*, 6 A.3d 238 (Del. Ch. 2010) (declining to find that LLC Act confers standing to sue derivatively on creditors of an insolvent LLC), *aff'd,* 28 A.3d 1037 (Del. 2011).

14

states:

> Section 9. <u>Management</u>
>
> (a) <u>Board of Directors</u>. The business and affairs of the Company shall be managed by or under the direction of a Board of one of more Directors designated by the Members. The Members may determine at any time in their sole and absolute discretion the number of Directors to constitute the Board. The authorized number of Directors may be increased or decreased by the Members at any time in their sole and absolute direction, upon notice to all Directors. The initial number of Directors shall be as set forth on Schedule D. Each Director elected, designated or appointed by the Members shall hold office until a successor is elected and qualified or until such Director's earlier death, resignation, expulsion or removal. Each Director shall execute and deliver the Management Agreement. Directors need not be a Member [sic]. The initial Directors designated by the Members are listed on Schedule D hereto.

This provision establishes a board-centric governance model tracking that of a corporation.

Equally important, when defining the Corporate Board's ability to delegate authority to committees, the Corporate LLC Agreement embraces the language of Section 141(c) of the Delaware General Corporation Law ("DGCL"). Section 9(f) provides as follows:

> (f) <u>Committees of Directors</u>.
>
> (i) The Board may, by resolution passed by a majority of the whole Board, designate one or more committees, each committee to consist of one or more of the Directors of the Company. The Board may designate one or more Directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.
>
> (ii) In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such members constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member.

15

(iii) Any such committee, to the extent provided in the resolution of the Board, and [sic] shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Company. Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the Board. Each committee shall keep regular minutes of its meetings and report the same to the Board when required.[7]

The presence of these corporate traits in the Corporate LLC Agreement calls for applying corporate precedents to derivative claims involving the entity. For present purposes, corporate law analogies should guide whether the Corporate Board can empower a special litigation committee comprising a single non-director.

### 2. The Role Of A Special Litigation Committee In Corporate Law

In *Zapata*, the Delaware Supreme Court addressed a question of first impression: whether a board of directors could assert control over a derivative action after a stockholder had obtained the right to represent the corporation and proceed beyond the pleading stage. 430 A.2d at 782-84. The Delaware Supreme Court held that a board of directors possessed the necessary authority under Section 141(a) of the DGCL to assert

---

[7] *Cf.* 8 *Del. C.* § 141(c)(2) ("The board of directors may designate 1 or more committees, each committee to consist of 1 or more of the directors of the corporation. The board may designate 1 or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. The bylaws may provide that in the absence or disqualification of a member of a committee, the member or members present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the board of directors to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent provided in the resolution of the board of directors, or in the bylaws of the corporation, shall have and may exercise all the powers and authority of the board of directors in the management of the business and affairs of the corporation . . . .").

16

control over the derivative action and that the board could delegate its authority to a committee of directors pursuant to Section 141(c) of the DGCL. *Id.* at 784-85.

Stated broadly, a derivative action is simply a claim belonging to an entity that an investor in the entity seeks to assert on the entity's behalf. "'Any claim belonging to the corporation may, in appropriate circumstances, be asserted in a derivative action,' including claims that do—and claims that do not—involve corporate mismanagement or breach of fiduciary duty."[8] A stockholder, however, does not automatically have the ability to sue on behalf of the corporation simply because the stockholder volunteers.

"[W]hen a corporation suffers harm, the board of directors is the institutional actor legally empowered under Delaware law to determine what, if any, remedial action the corporation should take, including pursuing litigation against the individuals involved." *In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 130 A.3d 934, 943 (Del. Ch. 2016). "A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."[9] "Directors of Delaware corporations derive their managerial decision

---

[8] 3 Stephen A. Radin, *The Business Judgment Rule* 3612 (6th ed. 2009) (quoting *Midland Food Servs., LLC v. Castle Hill Hldgs. V, LLC*, 792 A.2d 920, 931 (Del. Ch. 1999) (Strine, V.C.)); *see also* 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 13.10, at 13-24 (3d ed. Supp. 2014) (explaining that a derivative action can be used to bring any corporate right that the corporation "has refused for one reason or another to assert").

[9] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984). In *Brehm v. Eisner*, 746 A.2d 244, 253-54 (Del. 2000), the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested

17

making power, which encompasses decisions whether to initiate, or refrain from entering, litigation, from 8 *Del. C.* § 141(a)." *Zapata,* 430 A.2d at 782 (footnote omitted). "Section 141(a) vests statutory authority in the board of directors to determine what action the corporation will take with its litigation assets, just as with other corporate assets." *EZCORP*, 130 A.3d at 943.

In a derivative suit, a stockholder seeks to displace the board's authority. *Aronson,* 473 A.2d at 811. A stockholder can proceed if the board grants permission to sue. In a rare case, a board might grant permission explicitly.[10] More often it happens implicitly when the board fails to take a position on the litigation or declines to move to dismiss pursuant to Rule 23.1.[11] "As a matter of Delaware law, a stockholder whose litigation

---

deferential appellate review. *See id.* at 253 & n.13 (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch.*, 701 A.2d 70, 72-73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624-25 (Del. 1984); and *Aronson*, 471 A.2d at 814). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. *Brehm*, 746 A.2d at 253-54. The seven partially overruled precedents otherwise remain good law. This decision does not address the standard of appellate review. Although the technical rules of legal citation would require noting that each was reversed on other grounds by *Brehm*, this opinion omits the cumbersome subsequent history, which creates the misimpression that *Brehm* rejected core elements of the Delaware derivative action canon.

[10] *See Zapata*, 430 A.2d at 783 (explaining that in *Sohland v. Baker*, 141 A. 277 (Del. 1927), "the board supported [the plaintiff] in his efforts [to sue]" and he was therefore "allowed to proceed as the corporation's representative").

[11] *See Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 731 (Del. 1988) ("When a corporation takes a position regarding a derivative action asserted on its behalf, it cannot effectively stand neutral. Because of the inherent nature of the derivative action, a corporation's failure to object to a suit brought on its behalf must be viewed as an

efforts are opposed by the corporation does not have authority to sue on behalf of the corporation until there has been a finding of demand excusal or wrongful refusal." *EZCORP*, 130 A.3d at 943.

> Because directors are empowered to manage, or direct the management of, the business and affairs of the corporation, the right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation.

*Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993) (citation omitted). "The right to bring a derivative action does not come into existence until the plaintiff shareholder has made a demand on the corporation to institute such an action or until the shareholder has demonstrated that demand would be futile." *Kaplan*, 540 A.2d at 730.

The *Zapata* case involved a stockholder who had gained the power to sue, both because the corporation had not moved to dismiss and because it appeared that the directors had approved the acceleration of their own stock options, rendering them interested for purposes of demand futility analysis. Four years into the litigation, the board created a special litigation committee comprising two new outside directors, and it empowered the committee to investigate the litigation and determine what should happen to the claims. The board delegated its full authority to the committee, and the authorizing

---

approval for the shareholders' capacity to sue derivatively."); *see also In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 808-09 (Del. Ch. 2009) (Strine, V.C.) (holding that where a special litigation committee chose to assert certain claims itself, sought to dismiss others, and took no position on a third set, demand was excused as to the latter claims, and the stockholder plaintiffs could assert them derivatively).

19

resolution provided that the committee's determination would be "final [and] not subject to review by the Board of directors and . . . in all respects . . . binding upon the Corporation." 430 A.2d at 781. After conducting its investigation, the Committee concluded that the derivative claims should "be dismissed forthwith as their continued maintenance is inimical to the Company's best interests." *Id.*

To implement its conclusion, the Committee caused the nominal defendant corporation to move to dismiss the derivative litigation. The Court of Chancery denied the motion, holding that once the stockholder had gained authority to sue in a representative capacity, the board lacked the power to divest the stockholder of control over the litigation. *Maldonado v. Flynn*, 413 A.2d 1251, 1262 (Del. Ch. 1980), *rev'd*, 430 A.2d 779 (1981). The Court of Chancery held that the business judgment rule was not a source of authority and did not confer power on the board to dismiss the claims. *Id.* at 1257.

After accepting an interlocutory appeal, the Delaware Supreme Court reversed. The senior tribunal's opinion addressed both legal and equitable arguments, consistent with the following insightful observation of corporate scholar and statesman Adolf A. Berle:

> [I]n every case, corporate action must be twice tested: first, by the technical rules having to do with the existence and proper exercise of the power; second, by equitable rules somewhat analogous to those which apply in

favor of a *cestui que trust* to the trustee's exercise of wide powers granted to him in the instrument making him a fiduciary.[12]

For purposes of the current case, the more pertinent part of the *Zapata* decision is the portion in which the Delaware Supreme Court addressed the first of the tests, although the strongest lessons are drawn from the case as a whole.

From a theoretical standpoint, the high court agreed with the Court of Chancery that the business judgment rule did not provide a basis for the authority that the *Zapata* directors claimed. The Delaware Supreme Court instead located the source of that authority in Section 141(a):

> Corporations, existing because of legislative grace, possess authority as granted by the legislature. Directors of Delaware corporations derive their managerial decision making power, which encompasses decisions whether to initiate, or refrain from entering, litigation, from [Section 141(a)]. This statute is the fount of directorial powers. The "business judgment" rule is a judicial creation that presumes propriety, under certain circumstances in a board's decision. Viewed defensively, it does not create authority. . . . The board's managerial decision making power, however, comes from [Section] 141(a). The judicial creation and legislative grant are related because the "business judgment" rule evolved to give recognition and deference to directors' business expertise when exercising their managerial power under [Section] 141(a).

430 A.2d at 782.

---

[12] Adolf A. Berle, *Corporate Powers As Powers In Trust*, 44 Harv. L. Rev. 1049, 1049 (1931); *see Sample v. Morgan*, 914 A.2d 647, 673 (Del. Ch. 2007) (Strine, V.C.) (explaining that corporate acts are "'twice-tested'—once by the law and again by equity."); *accord Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 641 (Del. Ch. 2013) ("Corporate acts are 'twice-tested,' once for statutory compliance and again in equity."); *Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011) ("A reviewing court's role is to ensure that the corporation complied with the statute and acted in accordance with its fiduciary duties.").

Having identified the source of the board's power, the Delaware Supreme Court rejected the Court of Chancery's "determination that a stockholder, once demand is made and refused, possesses an independent, individual right to continue a derivative suit for breaches of fiduciary duty over objection by the corporation." *Id.* When framed "as an absolute rule," the high court deemed that proposition "erroneous." *Id.* Instead, the board as an institution "retained all of its corporate power concerning litigation decisions" and it therefore possessed the power to determine what would happen to a litigation asset. *Id.* at 785. The fact that demand was excused, futile, or otherwise rendered unnecessary did not "strip the board of its corporate power. . . . [T]he board [of the] entity remains empowered under [Section] 141(a) to make decisions regarding corporate litigation. The problem is one of member disqualification, not the absence of power in the board." *Id.* at 786.

This holding brought the Delaware Supreme Court to a related issue: whether a board could delegate its Section 141(a) authority to a committee. On this issue, the high court held that Section 141(c) controlled:

> We find our statute clearly requires an affirmative answer to this question. As has been noted, under an express provision of the statute, [Section 141(c)], a committee can exercise all of the authority of the board to the extent provided in the resolution of the board. Moreover, at least by analogy to our statutory section on interested directors, [Section 144], it seems clear that the Delaware statute is designed to permit disinterested directors to act for the board.

*Id.* at 786. The senior tribunal rejected the argument that "the interest taint of the board majority is per se a legal bar to the delegation of the board's power to an independent committee composed of disinterested board members." *Id.* The Delaware Supreme Court

reasoned that "[t]he committee can properly act for the corporation to move to dismiss derivative litigation that is believed to be detrimental to the corporation's best interest." *Id.*

Critical to the Delaware Supreme Court's ruling on this point was the observation that under Section 141(c), "a committee can exercise *all of the authority of the board* to the extent provided in the resolution of the board." *Id.* (emphasis added). For the *Zapata* procedure to function, the recipient of the delegation had to be able to wield the full authority of the board with respect to the litigation asset. A committee of directors could receive and exercise the board's full authority.[13]

Having dealt with the question of the existence of the power, the Delaware Supreme Court continued with Professor Berle's second step: the equitable standard of review that a court should use when reviewing a committee's exercise of its authority. In a path-breaking holding, the high court declined to follow other jurisdictions that had applied the deferential business judgment rule to a special litigation committee's decision regarding derivative litigation:

> We are not satisfied, however, that acceptance of the "business judgment" rationale at this stage of derivative litigation is a proper balancing point. While we admit an analogy with a normal case respecting board judgment, it seems to use that there is sufficient risk in the realities of a situation like the one presented in this case to justify caution beyond adherence to the theory of business judgment.

---

[13] There are some issues where the DGCL limits the ability of a committee to wield the full authority of the board. *See* 8 *Del. C.* § 141(c)(1) (committees formed prior to July 1, 1996) and § 141(c)(1) (committees formed on or after July 1, 1996). None of the limitations apply to derivative claims.

. . . .

> Moreover, notwithstanding our conviction that Delaware law entrusts the corporate power to a properly authorized committee, we must be mindful that directors are passing judgment on fellow directors in the same corporation and fellow directors, in this instance, who designated them to serve both as directors and committee members. The question naturally arises whether a "there but for the grace of God go I" empathy might not play a role. And the further question arises whether inquiry as to independence, good faith and reasonable investigation is sufficient safeguard against abuse, perhaps subconscious abuse.

*Id.* at 787.

Faced with this scenario, the Delaware Supreme Court crafted a new, two-part standard for the trial court to apply. First, the trial court "inquire[s] into the independence and good faith of the committee and the bases supporting its conclusions." *Id.* at 788. The committee members have the burden of proving their "independence [and] good faith" and that they conducted "a reasonable investigation." *Id.* If the trial court is satisfied that "the committee was independent and showed reasonable bases for good faith findings and recommendations," the first step is satisfied. *Id.* at 789. At that point, the trial court may proceed "in its discretion, to the next step[,]" under which the trial court "determine[s], applying its own independent business judgment, whether the motion should be granted." *Id.* "This means, of course, that instances could arise where a committee can establish its independence and sound bases for its good faith decisions and still have the corporation's motion denied." *Id.*

The second step was innovative, and the Delaware Supreme Court elaborated on its reasoning for including it:

24

The second step provides, we believe, the essential key in striking the balance between legitimate corporate claims as expressed in a derivative stockholder suit and a corporation's best interests as expressed by an independent investigating committee. . . . The second step is intended to thwart instances where corporate actions meet the criteria of step one, but the result does not appear to satisfy its spirit, or where corporate actions would simply prematurely terminate a stockholder grievance deserving of further consideration in the corporation's interest.

*Id.* at 789. As I understand it, "the trial court's task in the second step is to determine whether the SLC's recommended result falls within a range of reasonable outcomes that a disinterested and independent decision maker for the corporation, not acting under any compulsion and with the benefit of the information then available, could reasonably accept."[14]

---

[14] *In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 468 (Del. Ch. 2013); *see Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1997 WL 305829, at *13 (Del. Ch. May 30, 1997) (Allen, C.) ("[T]he second prong of the *Zapata* test requires that this court exercise its own business judgment with respect to the reasonableness of the settlement."); *see also Forsythe v. ESC Mgmt. Co. (U.S.), Inc.*, 2013 WL 458373, at *2 (Del. Ch. Feb. 6, 2013) (discussing range of reasonableness inquiry). *See generally* Kenneth B. Davis, Jr., *Structural Bias, Special Litigation Committees, and the Vagaries of Director Independence*, 90 Iowa L. Rev. 1305, 1360 (2005) ("[T]he court's review, as contemplated [by *Zapata*], is of the reasonableness of the SLC's business judgment rather than the substitution of its own."); Gregory V. Varallo et al., *From* Kahn *to* Carlton*: Recent Developments in Special Committee Practice,* 53 Bus. Law. 397, 421 (1998) ("Delaware courts, even when exercising their independent business judgment, are not likely to act as 'super directors' who override reasonable SLC decisions; rather, they are more likely to limit themselves to an analysis of the reasonableness of the SLC's decision."); E. Norman Veasey, *Seeking a Safe Harbor from Judicial Scrutiny of Directors' Business Decisions—An Analytical Framework for Litigation Strategy and Counseling Directors*, 37 Bus. Law. 1247, 1268 (1982) (interpreting *Zapata* to require the trial court to "decide whether or not the committee acted reasonably in terminating" and thereby adopting "a half-step requiring the court of chancery to invoke its independent discretion to analyze the reasonableness of the business judgment reached by the independent board committee (as opposed to superimposing its own business judgment)" (quotation marks omitted)).

With the benefit of hindsight, one can discern in *Zapata* the foundational concepts that animate enhanced scrutiny, the intermediate standard of review that the Delaware Supreme Court introduced openly some four years later in *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del. 1985). First, there is a specific and recurring decision-making context where the realities of the situation "can subtly undermine the decisions of even independent and disinterested directors."[15] Second, there is a need for an intermediate position which recognizes that "[i]nherent in these situations are subtle structural and situational conflicts that do not rise to a level sufficient to trigger entire fairness review, but also do not comfortably permit expansive judicial deference."[16]

---

[15] *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 43 (Del. Ch. 2013); *accord Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011); *see Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 42 (Del. 1994) ("[T]here are rare situations which mandate that a court take a more direct and active role in overseeing the decisions made and actions taken by directors. In these situations, a court subjects the directors' conduct to enhanced scrutiny to ensure that it is reasonable."); *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010) (Strine, V.C.) ("In a situation where heightened scrutiny applies, the predicate question of what the board's true motivation was comes into play. The court must take a nuanced and realistic look at the possibility that personal interests short of pure self-dealing have influenced the board to block a bid or to steer a deal to one bidder rather than another."). *See generally* Julian Velasco, *Structural Bias and the Need for Substantive Review*, 82 Wash. U. L.Q. 821, 870-83 (2004).

[16] *In re Rural Metro Corp. S'holder Litig.*, 88 A.3d 54, 81 (Del. Ch. 2014), *aff'd sub nom. RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816 (Del. 2015); *see Dollar Thrifty*, 14 A.3d at 597 ("Avoiding a crude bifurcation of the world into two starkly divergent categories—business judgment rule review reflecting a policy of maximal deference to disinterested board decisionmaking and entire fairness review reflecting a policy of extreme skepticism toward self-dealing decisions—the Delaware Supreme Court's *Unocal* and *Revlon* decisions adopted a middle ground."); *Golden Cycle, LLC v. Allan*, 1998 WL 892631, at *11 (Del. Ch. Dec. 10, 1998) (locating enhanced scrutiny under *Unocal* and *Revlon* between the business judgment rule and the entire fairness

26

Third, the resulting intermediate standard involves examining the reasonableness of the end that the directors chose to pursue, the path that they took to get there, and the fit between the means and the end.[17] The *Zapata* test thus can be properly regarded as a nascent form of enhanced scrutiny and integrated within the larger body of case law applying the intermediate standard.[18]

---

test); *see also* Stephen M. Bainbridge, Unocal *at 20: Director Primacy in Corporate Takeovers*, 31 Del. J. Corp. L. 769, 795-96 (2006) (explaining the Delaware Supreme Court's creation of an intermediate standard of review between the entire fairness and business judgment rule standards); Ronald J. Gilson, Unocal *Fifteen Years Later (And What We Can Do About It)*, 26 Del. J. Corp. L. 491, 496 (2001) ("In *Unocal*, the Delaware Supreme Court chose the middle ground that had been championed by no one. The court unveiled an intermediate standard of review . . . .").

[17] *See, e.g.*, *Dollar Thrifty*, 14 A.3d at 598 (explaining that when applying enhanced scrutiny, "the court seeks to assure itself that the board acted reasonably, in the sense of taking a logical and reasoned approach for the purpose of advancing a proper objective, and to thereby smoke out mere pretextual justifications for improperly motivated decisions"); *id.* at 599-600 ("[T]he reasonableness standard requires the court to consider for itself whether the board is truly well motivated (i.e., is it acting for the proper ends?) before ultimately determining whether its means were themselves a reasonable way of advancing those ends."); *Mercier v. Inter–Tel (Del.), Inc.*, 929 A.2d 786, 810-811 (Del. Ch. 2007) (Strine, V.C.) (explaining that when directors take action that affects stockholder voting, enhanced scrutiny requires that the defendant fiduciaries bear the burden of proving (i) that "their motivations were proper and not selfish," (ii) that they "did not preclude the stockholders from exercising their right to vote or coerce them into voting a particular way," and (iii) that the directors' actions "were reasonable in relation to their legitimate objective"); *id.* at 811 ("If for some reason, the fit between means and ends is not reasonable, the directors would also come up short.").

[18] *See In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *27 (Del. Ch. Jan. 25, 2016) (describing *Zapata* as having adopted "a test which marked the Delaware Supreme Court's first deployment of something akin to the two-step standard of review that later emerged as enhanced scrutiny"); *La. Mun. Police Emps. Ret. Sys. v. Morgan Stanley & Co., Inc.*, 2011 WL 773316, at *7 (Del. Ch. Mar. 4, 2011) ("An SLC's decision to dismiss a post-demand-excusal derivative claim is reviewed under *Zapata's* two-step standard, which effectively amounts to reasonableness review

Since *Zapata*, boards of directors of numerous Delaware corporations have formed special litigation committees to address derivative claims, with varying degrees of success.[19] The leading treatises do not identify, and the parties have not cited, a single occasion in which a Delaware court has approved the use of a special litigation committee staffed by a non-director, or even intimated that such a committee would pass muster. To the contrary, "the Court of Chancery has expressed an unwillingness to extend any deference to other types of investigatory committees of the board formed to investigate derivative claims but not formed under [the *Zapata*] framework." Drexler et al., *supra*, § 42.04 at 42-41 n.33 (citing cases).

The absence of any examples of delegations to non-directors does not reflect a lack of board authority to rely on non-directors to carry out tasks. In a modern corporation, the board is not expected to be involved in every decision, or even most

and a context-specific application of enhanced scrutiny."); Varallo, *supra,* at 423 n.121 ("The [*Zapata*] standard is also reminiscent of the enhanced scrutiny courts use to examine the actions of directors engaged in a sale of a corporation or other like transactions. . . . Perhaps the similarity . . . is best explained by the fact that in all of these situations courts would like to defer to the business judgment of a board, but because the scenarios in which these cases arise create a potential conflict of interest for board members, the court is only willing to do so if a board first demonstrates it is capable of making an independent business judgment and the judgment seems at least to make some rational sense."); Velasco, *supra*, at 849 (explaining that *Zapata* "is quite similar to *Unocal*").

[19] *See* 1 Balotti & Finkelstein, *supra*, § 13.17, at 13-83 to -91 (collecting cases); 2 David A. Drexler, et al., *Delaware Corporation Law & Practice* § 42.04, at 42-35 to -42 (2012 & Supp. 2015) (same); 3 Edward P. Welch, et al., *Folk on the Delaware General Corporation Law* § 327.04[E], at 13-171 to -188 (2016) (same); Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate & Commercial Practice in the Delaware Court of Chancery* § 9.02[c], at 9-120 to -141 (2015) (same).

decisions. "Few modern corporations could function effectively if that was the norm. In fact, it is the rare corporation that is actually 'managed by' the board; most corporations are managed 'under the direction of' the board." J. Travis Laster & John Mark Zeberkiewicz, *The Rights and Duties of Blockholder Directors*, 70 Bus. Law. 33, 36 (2015) (footnote omitted).

> [A]lthough ultimate responsibility for the direction and management of the corporation lies with the board, the law recognizes that corporate boards, comprised as they traditionally have been of persons dedicating less than all of their attention to that role, cannot themselves manage the operations of the firm, but may satisfy their obligations by thoughtfully appointing officers, establishing or approving goals and plans and monitoring performance. While it is the elected board of directors that bears the ultimate duty to manage or supervise the management of the business and affairs of the corporation, the duties of a board that oversees professional management ordinarily entail the obligation to establish or approve the long-term strategic, financial and organizational goals of the corporation; to approve formal or informal plans for the achievement of these goals; to monitor corporate performance; and to act, when in the good faith, informed judgment of the board it is appropriate to act.

*Id.* (footnotes and internal quotation marks omitted).

These general principles apply equally to litigation. Boards delegate responsibility for handling much of the litigation that a corporation faces to officers, including the company's General Counsel or Chief Legal Officer. Boards receive periodic updates on material litigation items, and they may approve settlements or address significant strategic decisions in major cases, but by and large, officers and their subordinates manage the litigation. Officers and other non-directors, however, cannot exercise the full power of the board of directors. They ultimately must report to the board of directors.

The absence of examples of delegations to non-directors reflects the fact that control over a derivative action, after the stockholder has gained authority to sue, is not an ordinary-course-of-business affair that a board can delegate to whomever it chooses. *Zapata* requires the involvement of a committee made up of directors because once a stockholder has gained authority to litigate derivatively on behalf of the corporation, the board's disinterestedness and independence has been called into doubt, either explicitly through a Rule 23.1 decision or implicitly because of the lack of any timely challenge to the stockholder's authority. Before the board can re-assert its power under Section 141(a), it must re-establish the existence of a disinterested and independent decision maker who is capable of exercising the full authority of the board. A full delegation is required because, as the *Zapata* case recognized, the decision over the litigation must be final and not reviewable by the conflicted directors.

A committee of directors is the only vessel that is capable of receiving and exercising the full authority of the board in this context. Under Section 141(c), a board may delegate to a committee all of the Section 141(a) authority that it possesses over a litigation asset. *See* 8 *Del. C.* §§ 141(c)(1) & (2). A board may not make a similarly complete delegation to an officer or a non-director. Doing so would risk an improper abdication of authority.[20] Hence the requirement exists that a *Zapata* committee be made up of directors.

_____

[20] *See, e.g.*, *Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 979 (Del. Ch. 2013) (holding that complaint stated a claim that board had abdicated its responsibilities by failing to conduct meaningful investigation and allowing management

30

### 3. The Lessons Of *Zapata* For The Corporate LLC

The Corporate LLC Agreement embraces a governance structure resembling that of a corporation, so *Zapata* applies fully to the special litigation committee that the Corporate Board purported to establish. The New York Federal Action had proceeded past the Rule 23.1 stage, which meant that Obeid had gained authority to pursue derivative claims on behalf of the Corporate LLC. Separately, the allegations of his complaint indicated that La Mack and Massaro were interested in the challenged transactions for purposes of demand futility. For both reasons, although the Corporate Board could re-assert its authority over the derivative claims that were at issue in the

---

to make decisions without oversight); *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 278 (Del. Ch. 2003) (holding that complaint stated a claim for breach of duty of loyalty and action not in good faith where it alleged that board failed to act on executive's compensation and abdicated decision-making responsibility to the company's CEO); *Nagy v. Bistricer*, 770 A.2d 43, 64 (Del. Ch. 2000) (Strine, V.C.) (holding that a board abdicated its statutory duty under Section 251(b) when it delegated the determination of the merger consideration to an investment bank selected by the acquirer); *Grimes v. Donald*, 1995 WL 54441, at *11 (Del. Ch. Jan. 11, 1995) (finding that complaint stated a claim that board had improperly delegated its authority under Section 141(a) to the CEO, where the board agreed not to engage in "unreasonable interference, in the good faith judgment of the Executive, by the Board . . . in the Executive's carrying out of his duties and responsibilities"), *aff'd*, 673 A.2d 1207 (Del. 1996); *Jackson v. Turnbull*, 1994 WL 174668, at *4-5 (Del. Ch. Feb. 8, 1994) (holding board impermissibly abdicated statutory obligation to set merger consideration by delegating task to its investment bankers), *aff'd*, 653 A.2d 306 (Del. 1994) (TABLE); *Sealy Mattress Co. of N.J. v. Sealy, Inc.*, 532 A.2d 1324, 1338 (Del. Ch. 1987) (holding that board "could not abdicate its obligation to make an informed decision on the fairness of the merger by simply deferring to the judgment of the controlling stockholder"). *See generally In re Bally's Grand Deriv. Litig.*, 1997 WL 305803, at *4 (Del. Ch. June 4, 1997) ("[O]ur courts will not uphold an agreement wherein the directors delegate duties which lie at the heart of the management of the corporation or which have the effect of removing from directors in a very substantial way their duty to use their own best judgment on management matters." (quotation marks omitted)).

New York Federal Action, the Corporate Board only could do so by re-establishing the existence of an independent and disinterested actor that was capable of wielding the full authority of the Corporate Board for purposes of making decisions regarding the derivative claims. The Corporate Board could have done that by forming a committee of independent directors and delegating the full authority of the Corporate Board over the derivative claims to that committee. Instead, La Mack and Massaro attempted to form a quasi-committee staffed by a non-director. However illustrious the credentials of that non-director might be, his involvement is not a sufficient substitute under *Zapata*.

In an effort to avoid this result, the Corporate LLC points to a provision in the LLC Act which permits managers and members to delegate their authority. It states:

> Unless otherwise provided in the limited liability company agreement, a member or manager of a limited liability company has the power and authority to delegate to 1 or more other persons the member's or manager's, as the case may be, rights and powers to manage and control the business and affairs of the limited liability company, including to delegate to agents, officers and employees of a member or manager of the limited liability company, and to delegate by a management agreement or another agreement with, or otherwise to, other persons.

6 *Del. C.* § 18-407. By its terms, this provision permits delegation to persons who are not managers of the LLC, including to "other persons."

In my view, Section 18-407 is intended to make clear that the individuals empowered to manage an LLC do not have to do everything themselves. Section 18-407 validates the vast array of ordinary-course-of-business delegations that are part of the operation of an entity. Just as a corporate board of directors can rely on and delegate tasks and responsibilities to officers, employees, advisors, and other persons, so too can

32

the members in a member-managed LLC or the managers in a manager-managed LLC. Section 18-407 does not validate every theoretically possible delegation, and it does not extend to the conflict-laden delegation of authority involved in the creation of a special litigation committee. Notably, several jurisdictions have addressed this latter issue by taking the additional step of including a specific provision in their LLC statutes that authorizes the formation of a special litigation committee made up of non-directors.[21]

Moreover, as a general default provision addressing the delegation of managerial authority, Section 18-407 does not trump the specific provisions of the LLC Act that address derivative actions. Section 18-1001, entitled "Right to Bring Action," provides that any member or assignee may bring a derivative suit "if managers or members with authority to do so have refused to bring the action or if an effort to cause those managers or members to bring the action is not likely to succeed." 6 *Del. C.* § 18-1001. Section 18-1003, entitled "Complaint," similarly provides that the complaint in a derivative action involving an LLC "shall set forth with particularity the effort, if any, of the plaintiff to secure initiation of the action by a manager or member or the reasons for not making the effort." 6 *Del. C.* § 18-1003. The language of Section 18-1001 implies, consistent with *Zapata*, that in a member-managed LLC, decisions regarding a derivative action must be made by the "members with authority to do so," and in a manager-managed LLC, by "managers . . . with authority to do so." The language of Section 18-1003 reinforces this

---

[21] *See, e.g.*, Colo. Rev. Stat. Ann. § 7-80-716 (2002); Fla. Stat. Ann. § 605.0804 (2014); Miss. Code Ann. § 79-29-1109 (2011); N.C. Gen. Stat. Ann. § 57D-8-03 (2014); Tex. Bus. Orgs. Code Ann. § 101.454 (2006).

implication. Together, the sections indicate that only the duly authorized decision-making body of the entity, be it the members or the managers, can make the necessary decision. This in turn implies that in a manager-managed LLC, control over derivative litigation must rest with the managers (or a subset of them).

Regardless, in this case, Section 18-407 cannot validate the Corporate Board's attempted delegation to a special litigation committee because the drafters of the Corporate LLC Agreement "provided otherwise." By embracing the governance structure of a corporation and including provisions paralleling Sections 141(a) and (c), the drafters of the Corporate LLC Agreement evidenced their intent to have corporate principles govern the Corporate Board. Those principles include *Zapata*, under which only a duly empowered committee of directors can serve as a special litigation committee.

Judge Hogan is not a director of the Corporate LLC. Consequently, under the Corporate LLC Agreement, he cannot function as a one-man special litigation committee on behalf of the Corporate LLC. Summary judgment is granted in Obeid's favor on this issue.

**B.     Judge Hogan's Ability To Serve As The Sole Member Of A Special Litigation Committee For The Manager-Managed LLC**

Obeid additionally seeks a declaratory judgment that Judge Hogan cannot serve as a one-man special litigation committee for the Manager-Managed LLC. The governance structure of the Manager-Managed LLC also exhibits corporate features, albeit not so pervasively as the Corporate LLC. It nevertheless seems likely that the reasoning applicable to the Corporate LLC compels the same result for the Manager-Managed LLC.

34

In this case, however, the language of the Manager-Managed LLC Agreement, read as a whole, decides the issue and prohibits the type of delegation that La Mack and Massaro attempted. Because Judge Hogan is not a manager of the Manager-Managed LLC, he cannot serve as a one-man special litigation committee for the Manager-Managed LLC.

The Manager-Managed LLC Agreement establishes a corporate-style division between members and managers in which members are passive and managers operate the business of the entity. Section 5.1 of the Manager-Managed LLC Agreement states: "Except as expressly provided otherwise in the [LLC] Act, the Certificate of Formation or this Agreement, the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed by, one or more Managers." Through this language, the Manager-Managed LLC Agreement departed from the default rule of member management under the LLC Act. Moreover, the drafters chose to do so by stating that the "the business and affairs of the Company shall be managed by, one or more Managers," which recalls similar language in Section 141(a) of the DGCL. *See* 8 *Del. C.* § 141(a) ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation."). In my view, the resulting structure is sufficient to cause the reasoning that governed the Corporate LLC to apply equally to the Manager-Managed LLC.

This decision need not reach that holding, however, because other sections of the Manager-Managed LLC Agreement, read as a whole, evidence a distinction between matters relating to the ordinary course of business of the LLC and more significant

35

matters that must be handled by the managers. In Section 5.1, the Manager-Managed LLC Agreement states that the "powers of the Company," which the managers have authority to exercise, include various items identified in a series of twelve subsections. They bear an obvious relationship to the Manager-Managed LLC's real estate business and fit with Section 2.8 of the Manager-Managed LLC Agreement, which states that the business purpose of the Corporate LLC is to "1) acquire, own, operate, develop, improve, manage and dispose of commercial real estate, 2) own and/or operate any subsidiaries and/or affiliates deemed necessary to the purposes stated in the previous clause, and 3) [engage in] an[y] other lawful act or activity for which a Limited Liability Company may be formed under the laws of the State of Delaware."

Among the "powers of the Company" that the managers are empowered to exercise on its behalf is the power of

> [e]mploying from time to time persons, firms or corporations for the operation and management of various aspects of the Company's business, including, without limitation, managing agents, contractors, subcontractors, architects, engineers, laborers, suppliers, accountants and attorneys on such terms and for such compensation as the Managers shall determine, notwithstanding the fact that the Managers or any Member may have a financial interest in such firms or corporations.

Manager-Managed LLC Agreement § 5.1.7. All of the types of "persons, firms or corporations" identified in Section 5.1.7 have a facial connection to "the Company's business."

By contrast, Section 5.9 of the Manager-Managed LLC Agreement addresses the degree to which managers may delegate their core governance functions. It states:

> The Managers may delegate to one or more of their number the authority to execute any documents or take any other actions deemed necessary or desirable in furtherance of any action that they have authorized on behalf of the Company as provided in Section 5.1 hereof. In addition, the Managers may restrict or limit the power or authority of any one or more of the Managers to such extent as deemed advisable by the Managers. Furthermore, the Managers may designate one or more Managers of the Company as the Company's duly appointed representative with specific authority to take certain actions on behalf of the Company.

Another informative section is Section 5.16, which discusses the role of the Operating Manager. It states, in pertinent part: "[E]xcept as otherwise provided in this Agreement, the Managers may delegate to any Manager the power, acting alone, to bind the Company and to carry out the directive of the Managers."

Taken together, these sections demonstrate that the drafters of the Manager-Managed LLC Agreement intended to limit the ability of managers to delegate their core governance functions. Authority over those types of issues only could be delegated to other managers. For purposes of Section 18-407 of the LLC Act, Sections 5.9 and 5.16 of the Managing-Member LLC Agreement "provides otherwise" and do not permit an issue as serious as the exercise of authority over derivative claims to be delegated to a non-manager. Because Judge Hogan is not a manager, he cannot serve as the sole member of a special litigation committee for the Manager-Managed LLC. Summary judgment is granted in Obeid's favor on this issue.

## C.     The Effectiveness Of Obeid's Removal As A Director Of The Corporate LLC

Obeid finally challenges his removal from the Corporate Board. The plain language of the Corporate LLC Agreement does not support his position.

37

Under Section 18-402 of the LLC Act, "a manager shall cease to be a manager as provided in a limited liability company agreement." Section 9(h) of the Corporate LLC Agreement provides that "[u]nless otherwise restricted by law, any Director or the entire Board of Directors may be removed or expelled, with or without cause, at any time by the Members, and any vacancy caused by any such removal or expulsion may be filled by action of the Members." The Corporate LLC Agreement does not provide a standard for determining when the members have taken action. The default rule in the LLC Act is that "the decision of members owning more than 50 percent of the said percentage or other interest in the profits [is] controlling." 6 *Del. C.* § 18-402.

Under this analysis, Obeid could be removed as a member of the Corporate Board by members owning "more than [a] 50 percent" interest in the profits of the Corporate LLC. That standard would make sense for the additional reason that the default rule under the DGCL is that "[a]ny director of the entire board of directors may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors." 8 *Del. C.* § 141(k). As noted, the Corporate LLC adopted a corporate-style governance structure, so a parallel rule is a logical result.

Together, Massaro and La Mack had a two-thirds interest in the profits of the Corporate LLC, giving them the necessary votes. Obeid argues against this result by pointing to Section 7(a) of the Corporate LLC Agreement, which states that the Corporate LLC may engage in "any lawful businesses or investments as the Members shall determine upon the vote of a majority in Interest." Obeid contends that Section 7(a) demonstrates that the drafters of the Corporate LLC Agreement knew how to choose a

majority of the profit interest as a voting standard, so they must have meant something else when they referred to "action of the Members." Obeid contends that "the Members" meant unanimity, because Schedule A of the Corporate LLC Agreement identifies the members as "each of William T. Obeid, Dante A. Massaro and Christopher F. La Mack, as initial members of the Company," plus any later added members.

The Corporate LLC Agreement, uses the term "members" to refer to Obeid, Massaro, and La Mack collectively on more than forty-five occasions. In addition to Section 9(h), seven use this phrase in a manner that seems to address the threshold necessary for action:

- Section 9(a): "The Members may determine at any time in their sole and absolute discretion the number of Directors to constitute the Board. The authorized number of Directors may be increased or decreased by the Members at any time in their sole and absolute discretion…."

- Section 11: "In the event that no officers are designated, all of the power and authority of the officers shall be vested in the Members and the Members shall have all power and authority to act on behalf of the Company as if the Members were an officer."

- Section 11(a): "The initial Officers of the Company shall be designated by the Members."

- Section 14: "[T]he Members may make additional capital contributions to the Company at any time upon the written consent of such Members."

- Section 17: "The Company's books of account shall be kept using the method of accounting determined by the Members. The Company's independent auditor, if any, shall be an independent public accounting firm selected by the Members."

- Section 22: "A Member may not resign, except as permitted by the other Members."

- Section 23: "One or more additional members of the Company may be admitted to the Company with the written consent of the Members."

- Section 31: "This Agreement may only be modified, altered, supplemented or amended pursuant to a written agreement executed and delivered by the Members."

If Obeid were correct, then the Corporate LLC Agreement would require unanimity on each of these issues, and any single member could create deadlock. Given the range of issues where this language appears, that is not a reasonable reading of the agreement.

Two other factors contribute to this conclusion. First, Section 7(a) is the *only* section of the Corporate LLC Agreement that uses the phrase "majority in Interest." The phrase itself is not defined, and although "Interest" is capitalized, that phrase is not defined either. This suggests that the inclusion of this language was not by design, but resulted from human error.

Second, Obeid, La Mack, and Massaro knew how to create a unanimity requirement, and they did so in the Manager-Managed LLC Agreement. Section 4.2.2 of that document requires the "approval of all of the Members" to take certain actions. The Manager-Managed LLC Agreement also explicitly grants each member a lifetime right to remain a manager, which is what Obeid's reading would accomplish for his status as a director under the Corporate LLC Agreement. To achieve this result, Section 4.14 of the Manager-Managed LLC Agreement states: "[T]he Members agree that each Member . . . shall be a Manager for so long as he or she is a Member of the Company and is living and competent . . . ." Despite knowing how to draft language that incorporated a unanimity standard or made a position permanent, Obeid, La Mack, and Massaro did not deploy those skills when preparing Section 9(h) of the Corporate LLC Agreement.

Obeid's reading of Section 9(h) is not a reasonable one. Members holding a majority of the interests in the profits of the Corporate LLC could remove him as a director. His motion for summary judgment on this issue is denied.

### III.    CONCLUSION

Obeid's motion for summary judgment is granted as to Judge Hogan's ability to serve as the sole member of the dual special litigation committees for the Corporate LLC and the Manager-Managed LLC. To be clear, this decision intends no criticism of Judge Hogan. The issue is solely one of authority under the LLC agreements.

In his motion, Obeid sought both (i) a declaratory judgment that Judge Hogan cannot act as a special litigation committee for either the Corporate LLC or the Manager-Managed LLC and that he has no authority over any derivative claims, including those asserted in the New York Federal Action, and (ii) an injunction preventing Judge Hogan from taking any action as a special litigation committee on behalf of either the Corporate LLC or the Manager-Managed LLC or attempting to exert any influence or control over any derivative claim. This decision has addressed item (i). There is no need to consider item (ii), as there is no indication that either of the defendants or Judge Hogan would attempt to act contrary to a judicial ruling.

As to his challenge to his removal from the Corporate Board, Obeid's motion for summary judgment is denied.